## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 14-40005-DDC** |
| **MICHELLE REULET (3),** **TERRIE ADAMS (6), and** **CRAIG BROOMBAUGH (10),** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

On October 23, 2015, the Court held a hearing on three motions by defendants:  (1) Motion to Exclude Government's Expert, I.T. and Law Enforcement Testimony (Doc. 478); (2) Motion to Exclude and/or Limit Expert Testimony (Doc. 479); and (3) Amended Motion to Exclude Government's Analogue Expert Testimony (Doc. 484).  The government filed its Response in Opposition to these motions on October 1, 2015 (Doc. 493).  The Court previously ruled on defendants' arguments to exclude law enforcement testimony (Doc. 525).  This Order rules on the remaining motions to exclude.

### I.    Background

Defendants are charged with conspiring to traffic in controlled substances and controlled substance analogues and mail fraud.  Ms. Reulet is charged with selling and dispensing counterfeit drugs, money laundering, and related crimes.  The government has identified a number of expert witnesses it intends to call at trial.  This order addresses defendants' objections to two information technology ("IT") experts, two pharmaceutical representative experts, a

1

financial expert, a Food and Drug Administration ("FDA") expert, and three analogue drug experts. *See generally* Docs. 291, 456 (Government's Fed. R. Crim. P. 16 disclosures).

## II.     Analysis

### A.  Legal Standard for Admissibility of Expert Testimony

The Court has a "gatekeeping obligation" to determine the admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The Court must perform its gatekeeping role for all expert testimony, not just scientific expert testimony. *See United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009). And, the Court has broad discretion when deciding whether to admit or exclude expert testimony. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1498 (10th Cir. 1996) (quoting *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court must apply a two-part test to determine admissibility under this rule. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).

First, it must decide "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting *United States v. Nacchio*, 555 F.3d

1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702)).  Second, the Court  "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'"  *Id.* (quoting *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (further citations omitted)).

To qualify as an expert, a witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in [its] search for truth."  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (internal quotation and citation omitted).  And, to determine whether the expert's testimony is reliable, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified a non-exhaustive list of factors that trial courts may consider when determining whether proffered expert testimony is reliable under Fed. R. Evid. 702.  These factors include:  (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the theory's general acceptance in the scientific community.  *Id.* at 593–94.  The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test" and a court's gatekeeping inquiry into reliability must be "tied to the facts of a particular case."  *Kumho Tire*, 526 U.S. at 150.  In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," instead of the *Daubert* factors and scientific foundation.  *Id.*  A district court should apply this traditional Rule 702 analysis when opinion testimony is based solely on experience or training, not a scientific methodology or technique.  *Kinser v. Gehl Co.*, 989 F. Supp. 1144, 1146 (D. Kan. 1997).  The Rule 702 analysis "is a

flexible one" and its focus "must be solely on principles and methodology, not the conclusions that they generate." *Daubert*, 509 U.S. at 594–95.

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241). But, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. While *Daubert* requires the Court to act as a gatekeeper for the admission of expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

Here, defendants argue that the Court should exercise its gatekeeping obligation and find some of the government's proposed expert testimony inadmissible under Rule 702. Defendants also assert that the government provided insufficient notice for some of the experts' testimony. A Federal Rule of Criminal Procedure 16 notice should provide "a written summary of [the] testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Crim. P. 16(a)(1)(G). Under Rule 16 the notice "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

The Court addresses the arguments for each expert, in turn, below.

**B.  IT Experts**

The government's Rule 16 disclosure notice identifies two IT experts, Lyndell Griffin and Lee Roediger. Doc. 291 at 15–16. The notice provides that these experts will testify about their "forensic examination of the seized computers and phones, and about [their] recovery of various e-mails from the computers and texts from the phones." *Id.* at 16. Their testimony "will

be based on [their] examination of the seized computers and phones, and [their] education, training, and experience." *Id.* Defendants do not object to this testimony if it is "limited to how the computers and phones were analyzed in order to extract the contents." Doc. 478 at 2. But, "[i]f the government contemplates testimony beyond this," defendants argue that the Rule 16 notice is insufficient. *Id.* The government responds that the IT experts' testimony will be limited to just that—how they analyzed the computers seized and how the contents were extracted. Doc. 493 at 26. Thus, defendants' argument is moot.

Defendants also argue that the bases for the experts' testimony cannot be their education, training, and experience. Doc. 478 at 3. They argue that education, training, and experience provide bases for qualifying an expert, but do not provide bases for opinions. The Court disagrees. As discussed in this Court's previous order, Doc. 525 at 9–11, training and experience can supply the requisite bases and reasons for an expert's testimony. *See, e.g.*, *Garza*, 566 F.3d at 1200 (allowing police officer's opinion testimony based on experience); *United States v. Markum*, 4 F.3d 891, 896 (10th Cir. 1993) (permitting firefighter's opinion testimony based on observations from his years of training and experience); *United States v. Jensen*, No. 1:12-CR-83 TS, 2014 WL 28998, at *2 (D. Utah Jan. 2, 2014) (finding a Rule 16 notice sufficient where "the bases and reasons are based on the experts' experiences as police officers"); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments (stating that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony" and explaining that a witness relying only on experience should "explain why that experience is a sufficient basis for the opinion").

The Court rejects defendants' objections to the content of the IT experts' testimony and concludes that the Rule 16 disclosures for the IT experts are sufficient.  The Court thus denies defendants' motion to exclude their testimony.

### C.  Pharmaceutical Representatives

Defendants argue that the Court must limit the testimony of two pharmaceutical representatives, Brian Donnelly and Mark Seitz.  Doc. 479 at 2.  The government's Rule 16 notice provides that these experts will "explain to the jury why" the Viagra and Cialis "distributed by the defendants [are] [ ] counterfeit product[s]."  Doc. 291 at 14–15.  Defendants assert that such testimony will violate Federal Rule of Evidence 704 because witnesses are not permitted to draw legal conclusions.  Doc. 479 at 2.  They contend that the Pfizer and Eli Lilly representatives "may provide evidence about Viagra and Cialis that allows the jury to compare those drugs to the products allegedly offered for sale or distribution . . . .  But they may not properly conclude for the jury that the products are 'counterfeit' . . . ."  *Id.* at 2–3.  The government argues that testimony opining that drugs are "counterfeit" is a factual conclusion, not a legal conclusion, and is permissible under the Federal Rules of Evidence.  Doc. 493 at 23.

 Federal Rule of Evidence 704 permits opinion testimony embracing an "ultimate issue" if the opinion is not otherwise objectionable. Fed. R. Evid. 704(a); *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) (citations omitted) (holding that an "expert may testify in the form of an opinion or inference as to ultimate issues to be decided by the trier of fact if the testimony is not otherwise objectionable").  But, "'[g]enerally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying law to the facts.'"  *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) (quoting *Okland Oil Co.*, 144 F.3d at 1328) (concluding that whether defendants acted

"recklessly" was a legal conclusion and thus properly excluded). The Tenth Circuit has explained that

> While testimony on ultimate facts is authorized under Rule 704, the [advisory] committee's comments [to Rule 704] emphasize that testimony on ultimate questions of law is not favored. The basis for this distinction is that testimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case.

*Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).

The Court must determine whether testimony that a drug is "counterfeit" is testimony about an ultimate fact, or inadmissible testimony on an ultimate question of law, or an inadmissible legal conclusion drawn by applying the law to the facts. If the testimony "articulates ultimate principles of law" and directs a verdict, it is impermissible. *Specht*, 853 F.2d at 808. But if the testimony merely assists "the jury's understanding and weighing of the evidence," it is permissible. *Id.*

Many courts have admitted testimony that an item is "counterfeit." *See, e.g.*, *United States v. Garrison*, 380 F. App'x 423, 426 (5th Cir. 2010) (allowing testimony from a counterfeit specialist that "every shirt seized . . . was in fact counterfeit"); *United States v. Garcia*, 718 F.2d 1528, 1534 (11th Cir. 1983) (allowing agent to testify "as an expert that the note seized . . . was, in fact, counterfeit"); *United States v. Love*, No. 09-cr-00526-MSK, 2010 WL 1931021, at *3 n.10 (D. Colo. May 13, 2010) (finding that a Rule 16 disclosure "will provide the [d]efendants with all of the information necessary to respond to any proffered opinion testimony that the products were counterfeit"); *United States v. Singleton*, No. 1:09-CR-546-RWS-GGB, 2010 WL 3723912, at *1–2 (N.D. Ga. Aug. 2, 2010) (internal citations omitted) (finding expert opinion testimony that gold certificates were counterfeit admissible because expert's experience alone was a sufficient foundation for the expert testimony, and the testimony would be helpful to the

jury); *Motorola, Inc. v. Abeckaser*, No. 07-cv-3963 (CPS) (SMG), 2009 WL 962809, at *5–6 (E.D.N.Y. Apr. 8, 2009) (allowing expert testimony that goods were counterfeit because the expert was qualified to testify based on knowledge and experience, and his method of assessing the authenticity of the products was reliable and based on observable facts). And, whether an item is counterfeit often is considered a factual issue for the jury to decide. *See United States v. Chong Lam*, 677 F.3d 190, 193 n.3, 198 n.7 (4th Cir. 2012) (instructing the jury that, despite U.S. Customs and Border Protection's opinion that the goods were counterfeit, it was their responsibility to decide the factual issue of whether a mark used met the statutory definition of counterfeit); *United States v. Bruning*, 30 F.3d 142, 1994 WL 363549, at *1 (10th Cir. July 13, 1994) (unpublished table opinion) (stating that "[t]he issue of whether or not counterfeit bills were obviously counterfeit and unlikely to be accepted if passed is a factual issue"); *United States v. Guy*, 456 F.2d 1157, 1166 (8th Cir. 1972) (referring to the issue "whether the notes . . . were in fact counterfeit" as a "factual issue" and noting that several witnesses testified that the notes were counterfeit).

But, the Court recognizes that attempting to distinguish between factual and legal conclusions is not an exact science:

> [I]t is often impossible . . . to draw a sound distinction between "fact" and "law" since many opinions mix aspects of both. . . . [Rule 704(a) was designed] to avoid the odd verbal circumlocutions in which courts engaged when attempting to draw the distinction between legal conclusions and opinions as to ultimate facts. . . . [I]n applying Rule 704(a) to opinions that may involve conclusions of law, focus should be on the provision's requirement that those opinions must be otherwise admissible. . . . In cases involving expert opinion, admissibility under Rule 702 depends on whether the opinion will assist the trier of fact to understand the evidence or determine a fact in issue. . . . Thus the admissibility of opinion testimony that may involve legal conclusions ultimately rests upon whether that testimony helps the jury resolve the fact issues in the case.

29 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure* § 6284 (1997) (internal

quotation marks and citations omitted).

Here, the pharmaceutical representatives' testimony concluding that the drugs in issue are

"counterfeit" arguably presents a mixed question of law and fact.  Defendant Michelle Reulet is

charged with violating 18 U.S.C. § 331(i)(3), which prohibits "the sale or dispensing, or the

holding for sale or dispensing, of a counterfeit drug."  18 U.S.C. § 331(i)(3).  And "counterfeit

drug" statutorily is defined as:

> a drug which, or the container or labeling of which, without authorization, bears
> the trademark, trade name, or other identifying mark, imprint, or device, or any
> likeness thereof, of a drug manufacturer, processor, packer, or distributor other
> than the person or persons who in fact manufactured, processed, packed, or
> distributed such drug and which thereby falsely purports or is represented to be
> the product of, or to have been packed or distributed by, such other drug
> manufacturer, processor, packer, or distributor.

21 U.S.C. § 321(g)(2).  Thus, "counterfeit" is not a purely factual issue here, because the jury

must apply the legal definition, as instructed by the Court, to determine if the drugs were

"counterfeit drugs."  But while the statute defines "counterfeit drug," expert opinion testimony

that the drugs examined are "counterfeit" does not tell the jury how to decide the ultimate

question of law—*i.e.* whether Ms. Reulet sold or dispensed a counterfeit drug.  The Court

determines if the testimony is otherwise admissible by looking at whether it will help the jury

understand the evidence or resolve a fact in issue.

The Court should exclude opinions phrased "in terms of inadequately explored legal

criteria."  *See* Fed. R. Evid. 704 advisory committee's notes (1972).  For example, the Court

should exclude a question asking if a person had "capacity to make a will."  *Id.*  But, if the

question is worded in terms of whether the person "had sufficient mental capacity to know the

nature and extent of his property," the Court should allow the question.  *Id.*  If a witness uses

language that does not have a specific legal meaning, the witness' opinion would not be excluded because he did not phrase his opinion "in terms of inadequately explored legal criteria."  29 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure* § 6284 (1997).  And, "[e]ven where a witness uses language that has a legal meaning and that meaning is not explained, the courts still may admit the witness' opinion.  This may be proper where the language also has a meaning understandable to laypeople and the lay meaning is the same as the legal meaning or the witness clearly intended to employ the lay meaning."  *Id.*

Here, "counterfeit" has both a legal meaning under § 321(g)(2) and a meaning that laypeople commonly understand.  If the pharmaceutical representatives conclude that the drugs examined are "counterfeit," the jury is capable of understanding what this assertion means, and the lay meaning is, in essence, the same as the legal meaning.  Moreover, the witnesses likely will employ the lay meaning of "counterfeit."  And, the experts here are not "merely stating an opinion on an ultimate issue without adequately exploring the criteria upon which [their] opinions are based."  *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993).  The disclosure explains that the experts will describe in detail how they reached their conclusions that the drugs are counterfeit— the testimony will describe the pills and packaging of their companies' products compared to the pills in issue.  This will give the jury "independent means by which it can reach its own conclusion or give proper weight to the expert testimony."  *See id.* at 188–89.

The opinion testimony here will not merely tell the jury what result to reach.  *See* Fed. R. Evid. 704 advisory committee's note (1972) (stating that the evidentiary rules like Rule 702 provide "ample assurances against the admission of opinions which would merely tell the jury what result to reach").  The pharmaceutical representatives' testimony will assist the jury—who likely will lack experience sufficient to understand the intricacies of drug manufacturing, design,

and packaging—in understanding the evidence and determining whether the drugs in issue are "counterfeit drugs." *See Singleton*, 2010 WL 3723912, at *1–2 (internal citations omitted) (finding expert opinion testimony that gold certificates were counterfeit admissible because the testimony would be helpful to the jury); *Motorola, Inc.*, 2009 WL 962809, at *5–6 (allowing job quality manager, who compared the alleged counterfeit products to the genuine products and analyzed the differences, to give expert opinion testimony that the goods were counterfeit because "there is no question that [the expert's] opinion concerning the authenticity of defendants' goods would assist the trier of fact in determining whether the goods at issue are counterfeit"). Ms. Reulet is free to cross-examine the witnesses and present contrary evidence. The Court will instruct the jury that they are free to accept or reject the experts' conclusions, and that they must apply the legal definition of "counterfeit drug" to make their ultimate decision of guilt or innocence.

In sum, the Court concludes that testimony that the drugs examined are "counterfeit" is properly admissible under Rules 702 and 704. The Court thus denies defendants' motion to exclude the pharmaceutical representatives' testimony. The pharmaceutical representatives may make comparisons between the drugs sold by their companies and the alleged counterfeit drugs. They may also opine that the drugs examined are "counterfeit" versions of the drugs sold by their companies. However, the experts are not allowed to testify that Ms. Reulet engaged in the sale of counterfeit drugs because that merely would tell the jury what result to reach and such a conclusion is impermissible.

### D.  Financial Expert

#### 1.  Reliability of Financial Analysis Testimony

Defendants argue that the Court should exclude testimony from the government's financial expert, Allen Spiece, under Rule 702 because it is not reliable.  Doc. 479 at 3.  The government's Rule 16 disclosure provides, "Mr. Spiece will testify about his financial analysis of the defendants' banking and other financial records, to include the amount of money the defendants obtained from their sales of controlled substances and controlled substance analogues."  Doc. 291 at 16.  The bases and reasons for his opinions are "his examination of the defendants' banking and other financial records, his education, training, and experience."  *Id.* at 17.  Defendants argue that the government needs to identify which banking records form the basis for his opinions, which principles or methodologies he has applied to the underlying data to reach his conclusions, and how he applied those principles or methodologies.  Doc. 470 at 4.  Without this information, defendants argue, the government has not provided enough information to meet its burden for admissibility under Rule 702.  *Id.*  In its response, the government explains that Mr. Spiece's testimony about defendants' finances is "merely a factual recitation of key information in the defendants' banking records" and his review was simple reading and math, no particular principles and methodologies.  Doc. 493 at 24.  The government argues that Mr. Spiece will testify as a factual or summary witness, and thus this testimony is admissible.  *Id.*  The Court agrees.  Mr. Spiece's proposed factual testimony does not fall within the purview of Rule 702.

And, to the extent Mr. Spiece may provide expert testimony, he may base his opinions "on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  But at this stage, the government need not identify for defendants which

particular records form the bases of the opinions or his principles and methodologies.  As discussed in the Court's previous order on law enforcement testimony, the criminal procedure discovery rules do not require the extensive disclosures required under the civil rules.  Doc. 525 at 6–9 (noting that a Rule 16 notice is "not required . . . to provide all of the data or other information considered to form the opinions" and "need not describe the witness's methodology" (citations omitted)).  Moreover, the Court finds that utilizing math to analyze financial records appears to be a reliable method, which can be reliably applied to the facts under Rule 702.  If opinion testimony proffered at trial uses principles/methods in an unreliable fashion, defendants may reassert their objection.

The Court denies defendants' motion to exclude this testimony.

### 2.  Legal Conclusions Testimony

Next, defendants argue that the Court must prohibit Mr. Spiece from drawing legal conclusions for the jury.  Doc. 479 at 5.  In particular, defendants assert that the Court should prohibit Mr. Spiece from testifying that "certain financial transactions constituted money laundering and structuring" or that "the transactions he has analyzed relate to 'criminally derived property.'"  *Id.*  Defendants argue that the jury alone should make these determinations.  *Id.*  The government's Rule 16 disclosure explains that Mr. Spiece will testify about structuring and money laundering and "why the transactions listed  . . . constitute" structuring and money laundering.  Doc. 291 at 16.  The government argues that the jury's job is to determine factual issues, not legal issues.  Doc. 493 at 24.  And it asserts that "Mr. Spiece is well-qualified to testify to the ultimate issue of fact that the transactions . . . constitute money laundering."  *Id.*

As discussed above, Rule 704 permits testimony on ultimate issues if not otherwise objectionable, but experts should refrain from stating their opinions about legal standards or legal

13

conclusions drawn by applying law to the facts.  *See* Fed. R. Evid. 704(a); *Christiansen*, 332 F.3d at 1283; *Okland Oil Co.*, 144 F.3d at 1328.  And under Rule 702, expert testimony is admissible where it "will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702.  "In assessing whether testimony will assist the trier of fact, district courts consider several factors, including whether the testimony 'is within the juror's common knowledge and experience' . . . . " *United States v. Garcia*, 635 F.3d 472, 476–77 (10th Cir. 2011) (quoting *Rodriguez–Felix*, 450 F.3d at 1123).  If the jury can understand the evidence without needing the expert's specialized knowledge, the expert testimony is inadmissible.  *See id.* at 477 (citing *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir. 2000)).  And, "[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.  When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination." *United States v. Bates*, No. 1:11-cr-00123-BLW, 2012 WL 1579590, at *1 (D. Idaho May 4, 2012).  Thus, an expert can testify to the extent it is helpful to the jury, but "should avoid legal conclusions, which usurp[] the jury's role."  *Id.* (citing *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992)); *see also United States v. Rich*, 145 F. App'x 486, 488 (5th Cir. 2005) (explaining that expert testimony stating legal conclusions about ultimate issues is inadmissible).

Methods of money laundering and structuring are not within the common knowledge of the jury.  *Id.*  And, "expert testimony on these topics will assist the jurors in understanding the evidence." *Id.*  But, determining guilt or innocence is solely for the jury, and thus the Court cannot allow an expert to testify "that the conduct underlying the money-laundering counts was . . . money laundering."  *Rich*, 145 F. App'x at 488.  When an expert testifies that a defendant's

conduct constitutes money laundering under the federal statute this is an impermissible legal conclusion. *Id.*; *see also United States v. Pemberton*, 121 F.3d 1157, 1166 (8th Cir. 1997) (finding that any prejudice from IRS agent's testimony that a transaction constituted money laundering was cured by district court's instruction to disregard the testimony).

Here, Mr. Spiece could testify about the methods of money laundering and structuring. For example, he may explain what money laundering is and speak generally about the aspects of money laundering. *See Bates*, 2012 WL 1579590, at *1. He may also use alternative language to express his opinion on the transactions in question. *See Simpson*, 7 F.3d at 189 (noting that the district court properly prohibited testimony on whether the transactions constituted misapplication or concealment after the court discussed alternative means by which the expert could express his opinions). But, he cannot opine on an ultimate legal conclusion—*i.e.*, that what Ms. Reulet did constituted money laundering or structuring. *See Bates*, 2012 WL 1579590, at *1 (allowing testimony on the theory and processes of money laundering but prohibiting the expert from expressing "an opinion on ultimate conclusions of law or fact—such as whether the case amounts to money laundering or not, and whether certain behavior at issue in this case would be a typical money laundering activity"); *see also Rich*, 145 F. App'x at 488 (finding plain error where IRS agent was permitted to testify that defendant's conduct constituted money laundering). The Court will instruct the jury on the law of money laundering and structuring, and the government may argue that Ms. Reulet's conduct falls within the Court's definition. But, ultimately the jury must apply the law to the facts and conclude whether Ms. Reulet is guilty of money laundering or structuring.

Mr. Spiece also could express his opinion about where the money in the accounts came from. However, he may not testify that "the transactions he has analyzed relate to 'criminally

derived property.'"  The Court notes that the government's Rule 16 disclosure does not state explicitly that Mr. Spiece would provide such testimony.  *See* Doc. 291 at 16–17.  But, because defendants have raised the issue of potential testimony of this nature, the Court addresses it now. "Criminally derived property" statutorily is defined as "property constituting, or derived from, proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(2).  The definition presupposes the commission of a criminal offense.  Because the jury must first determine if a criminal offense was committed before determining guilt under 18 U.S.C. §1957, testimony about "criminally derived property" in a way usurps the jury's role by telling the jury what legal conclusion to reach.  *See Simpson*, 7 F.3d at 188 (noting that expert testimony that "states a legal conclusion, usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law" often is excluded).  And, unlike "counterfeit," "criminally derived property" has no lay meaning understandable to the jury.  The Court therefore cautions that testimony that transactions relate to "criminally derived property" is inadmissible.

The Court thus grants in part and denies in part defendants' motion to exclude Mr. Spiece's testimony.

### E.  FDA Expert

Defendants next object to the testimony of the government's FDA expert, Dr. Charles E. Lee.  Doc. 479 at 6.  The government's Rule 16 disclosure states that Dr. Lee will testify that the FDA has never approved the drugs in this case.  Doc. 291 at 11.  Dr. Lee also "will discuss what [the] FDA generally expects to see on the label of an FDA-compliant drug" and opine "that the products the defendants sold were misbranded drugs."  *Id.* at 11–12.  Defendants claim that this testimony is irrelevant because the Second Superseding Indictment contains no misbranding charges, and without any such charges, the testimony is not helpful to the jury under Rule 702.

16

The government responds that Dr. Lee's testimony is still relevant to the conspiracy to commit mail fraud charges.  Doc. 493 at 25.   After reviewing the remaining charges in the Second Superseding Indictment, the Court declines to deem Dr. Lee's testimony irrelevant at this time. The Court thus denies defendants' motion to exclude Dr. Lee's testimony.

### F.  Detective Farkes

Defendants object to Detective Farkes' testimony as an analogue expert.  Doc. 484 at 15. They contend that he is not qualified to testify about the chemical structures or pharmacological effects of non-controlled substances, and thus the Court should exclude his testimony under Rule 702.  *Id.*  Defendants assert that his curriculum vitae lacks a basis for his expertise in chemistry or pharmacology, and argue that the government's Rule 16 notice is insufficient because it only states his "education, training, and experience" as the bases and reasons for the opinions.  *Id.* The government responds that Detective Farkes will not offer any opinions about chemical structure or pharmacological effects.  Doc. 493 at 22.  And it claims that its notice "cannot be read to indicate anything of the sort."  *Id.*  Instead, the government says he will testify about what he did and observed, and will educate the jury about the synthetic drug industry from a law enforcement perspective.  *Id.* at 22–23.

Again, the Court directs the parties that training and experience are sufficient bases for *certain* opinions.  But, contrary to the government's assertion, the Court reads the government's Rule 16 notice to include testimony about chemical structure and pharmacological effects, which likely exceed the bounds of Detective Farkes' experience and training as a law enforcement officer.  For example, the notice states that he may testify that "individuals produce and distribute substances which have a slightly different chemical structure than a common and known illegal drug, but, when ingested will produce the same pharmacological effect on the

human body as the common and known illegal drug." Doc. 291 at 8.  And he will also testify about the ingredients commonly used to make the synthetic products, including a "synthetic compound pharmacologically similar to THC" and "a substituted cathinone pharmacologically similar to Methcathinone." *Id.* at 8–9.  He also will explain that smokable synthetic cannabinoids and substituted cathinones "are considered hallucinogens" and affect the human body in a similar way to scheduled drugs, like THC.  *Id.*  From this notice, the Court is not convinced that Detective Farkes' experience as a law enforcement officer provides a sufficient basis for his proposed testimony.  The proposed testimony appears to exceed the bounds of factual testimony to possibly unqualified opinion testimony.  The government must provide defendants a notice sufficiently describing the bases for any opinion testimony from Detective Farkes involving the chemical structure or pharmacological effects of synthetic drugs.

While the Court does not exclude Detective Farkes' proffered testimony at this time, the Court is wary of parts of his testimony because it appears he is not qualified to offer them or because they are irrelevant.  The parties may raise remaining relevance and reliability concerns at trial.  And the Court will determine the admissibility of his testimony then.

### G.  DEA Chemists

Finally, defendants argue that the Court should exclude the proposed expert testimony of Dr. Willenbring, DEA chemist, and Dr. Trecki, DEA pharmacologist, for a number of reasons. These two experts will testify about controlled substance analogues.  A controlled substance analogue is a substance:

(i)    the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii)   which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or

hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii)    with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32).

First, defendants contend that allowing these experts to testify that a substance is "substantially similar" is testimony about "an ultimate legal question that should be reserved for the jurors." Doc. 484 at 9. The Court disagrees. As discussed above, expert testimony should not usurp the role of the jury in applying the law to the facts. *See, e.g.*, *Garcia*, 635 F.3d at 476–77; *Bates*, 2012 WL 1579590, at *1; *Rich*, 145 F. App'x at 488. But, expert testimony that helps the jury understand the evidence or determine a fact in issue is admissible. *See* Fed. R. Evid. 702. While "substantially similar" is part of the statutory definition of controlled substance analogue, the government correctly points out that "[w]hether a particular substance qualifies as a controlled substance analogue is a question of fact." *United States v. Klecker*, 348 F.3d 69, 72 (4th Cir. 2003) (citing *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002), *cert. denied*, 537 U.S. 1112 (2003)). And, the testimony here will help the jury understand complex chemical structures and ultimately determine whether the drugs qualify as controlled substance analogues. *See United States v. Lawton*, 84 F. Supp. 3d 331, 339 (D. Vt. 2015) (internal citations and quotations omitted). As explained below, such testimony will not usurp the role of the jury.

Congress did not define "substantially similar" and "there is no indication that Congress intended the words 'substantially similar' to have a specialized or scientific meaning." *United States v. Lawton*, 84 F. Supp. 3d 331, 335 (D. Vt. 2015) (internal citations and quotations omitted). Thus, "substantially similar" should be given its ordinary, lay meaning. *Id.*; *see also*

*United States v. Brown*, 279 F. Supp. 2d 1238, 1240 (S.D. Ala. 2003), *aff'd* 415 F. 3d 1257 (11th Cir. 2005) ("Since the Analogue Act does not indicate that the term 'substantially similar' is to be defined as it is used scientifically, the court will interpret those words as they are used in everyday language."). And, "expert conclusions [about] substantial similarity will not usurp the role of . . . the jury," because the jurors are capable of understanding that lay meaning and can weigh the testimony and ultimately draw their own conclusion whether the substances in issue are "substantially similar" to scheduled controlled substances. *Id.* The Court's instructions will instruct the jurors to draw their own conclusions. Moreover, the Court notes that a number of courts have permitted experts to testify that a drug is "substantially similar" to a controlled substance. *See, e.g.*, *Lawton*, 84 F. Supp. 3d at 339; *United States v. Bays*, No. 3:13-CR-0357-B, 2014 WL 3764876, at *6–8, 11–12 (N.D. Tex. July 31, 2014); *United States v. Forbes*, 806 F. Supp. 232, 233–34 (D. Colo. 1992).

These experts can help the jury understand what similarities in chemical structure and pharmacological effect exist, if any, between the drugs in issue and scheduled controlled substances. Defendants plan to put on their own experts about these matters, and will have an opportunity to cross-examine the government's witnesses. To aid the jury, the experts may testify that the drugs are "substantially similar," just as defendants' experts can testify that they are not. The Court thus concludes that testimony that the drugs examined are "substantially similar" to scheduled controlled substances is admissible, and denies defendants' motion to exclude such testimony.

Second, defendants argue that permitting the DEA agents to testify about substantial similarity is unfairly prejudicial because the jury may give false weight to a government agent's testimony. Doc. 484 at 9. The Court, however, rejects this argument. Defendants have provided

no direct evidence that these experts' opinions are compromised in any way.  They do not

contest that these experts are well-qualified with extensive credentials and experience in their

fields.  Inherent in all government employee testimony is the potential for bias or prejudice, and

defendants may address any such bias or prejudice through cross-examination.  *See Abeyta v.*

*United States*, 368 F.2d 544, 545 (10th Cir. 1966) (noting that cross-examination may be used to

show bias or prejudice).

Third, defendants argue that the government's amended expert notice is insufficient

under Rule 16(a)(1)(G) because it does not give a summary of these experts' opinions or the

bases and reasons for those opinions.  Doc. 484 at 20.  Specifically, defendants argue that the

government must expand on their statement that Dr. Willenbring and Dr. Trecki will "testify

about the recent increase in analogue drugs in the United States, the potential dangers of

analogue drugs, and the DEA's efforts to temporarily and permanently schedule drugs that pose

an imminent threat to public safety."  Doc. 456 at 2.  The government points out that the

amended notice does not offer additional opinions, just topics for factual testimony.  Doc. 493 at

21–22.  The Court agrees with the government and finds that the Rule 16 notices provided to

defendants for these experts suffice.

Finally, defendants argue that the analogue expert testimony is unreliable under *Daubert*

and Rule 702.  The Court addresses their general attacks to admissibility, and then addresses

defendants' specific objections to each expert individually, below.  Defendants assert that when

the *Daubert* factors are applied to these experts' opinions, their principles and methods are

unreliable because they "are not subject to peer review, no operational standards are in place that

allow for rate of error to be measured, no outside peer review or accessible publications are

provided, and general acceptance in the relevant scientific community has not been established." *See* Doc. 484 at 17–18.

The Court disagrees.  The *Daubert* and Rule 702 analysis is flexible, and testimony need not conform to all of the factors listed in *Daubert* to be admissible.  *See Kumho Tire*, 526 U.S. at 150; *Daubert*, 509 U.S. at 594–95; *see also United States v. Brown*, 415 F.3d 1257, 1267–68 (11th Cir. 2005) (finding admissible expert testimony that met only one of the four *Daubert* factors—it was not quantitative, testable, or peer-reviewed, but was generally accepted).  In analogue drug cases, "there is no one avenue that an expert must take to determine whether two chemical compounds are substantially similar."  *United States v. Bays*, No. 3:13-CR-0357-B, 2014 WL 3764876, at *7 (N.D. Tex. July 31, 2014).  Lack of peer-reviewed materials goes to weight, not admissibility.  *Lawton*, 84 F. Supp. 3d at 339; *Bays*, 2014 WL 3764876, at *9 (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).  And publication "does not necessarily correlate with reliability."  *Daubert*, 509 U.S. at 593.  While experts may disagree about substantial similarity, expert opinions such as these are "'widely accepted by courts' in Analogue Act cases" as relevant and reliable under *Daubert* and Rule 702.  *Id.* (quoting *Bays*, 2014 WL 3764876, at *9 (further citations omitted)).  The Court rejects defendants' blanket argument that the *Daubert* factors require exclusion of these experts' testimony.

### 1.  Dr. Willenbring

Specifically, defendants argue that the Court should prohibit Dr. Willenbring from testifying that two substances are substantially similar in chemical structure because his use of two-dimensional diagrams is unreliable.  Doc. 484 at 9–10.  Defendants contend that two-dimensional models are "rudimentary" and do not account for a variety of factors that also contribute to chemical structure.  Doc. 484 at 9–10.  The government argues that Dr.

22

Willenbring's report shows he used two-dimensional and three-dimensional models, among other resources, in reaching his conclusion that the drugs in issue are substantially similar to controlled substances.  Doc. 493 at 13–14, 17.  And, the government asserts that his methods are reliable and many courts have admitted them.  *Id.* at 14, 17–18, 20.

The Court finds Dr. Willenbring's testimony admissible under Rule 702.  "[T]wo-dimensional modeling is a reliable method of comparing the chemical structure of two chemical compounds."  *Bays*, 2014 WL 3764876, at *8; *see also Lawton*, 84 F. Supp. 3d at 335 (where government's expert emphasized two-dimensional similarity in chemical structure, while defense expert testified about three-dimensional differences); *United States v. Fedida*, 942 F. Supp. 2d 1270, 1279 (M.D. Fla. 2013) (finding that "a reasonable person who examines the two-dimensional drawings of the chemical structures . . . could plausibly conclude that such substances are substantially similar").  And, Dr. Willenbring does not rely solely on two-dimensional models.  This Court, as many others have done, will allow Dr. Willenbring's testimony.

### 2.  Dr. Trecki

Defendants object to Dr. Trecki's opinion that the drugs in issue are substantially similar in pharmacologic effect to controlled substances.  Doc. 484 at 10–15.  In particular, they assert that his use of preclinical data is speculative and unreliable.  *Id.* at 10.  Defendants argue that no clinical studies exist showing the pharmacological effects of the substances on humans, and animal studies cannot indicate accurately effects on humans.  *Id.* at 10–14.  Instead, Dr. Trecki relies on Structure Activity Relationship (SARs) Analyses, *in vitro* studies, and *in vivo* studies, which are all preclinical.  *Id.*  Defendants' basic assertion is that these methods cannot prove the effect on humans with enough certainty for the Court to find them reliable.  *See* Doc. 484 at 10–

15. The government argues that Dr. Trecki's methods are commonly used and reliable. Doc. 493 at 14–16, 18–19. It points to a number of cases where district courts have allowed him to testify about the substantial similarity of the pharmacological effects of synthetic drugs to scheduled drugs. *Id.* at 20. And it contends that defendants are free to have their expert testify that effects of these drugs are not supported by human clinical trials, and may cross examine Dr. Trecki about the limitations of preclinical data. But, the government contends these limitations go to weight not admissibility. *Id.* at 15, 18. The government also argues that the FDA would not permit human trials of such substances because they have no therapeutic or medical use. *Id.* at 15–16.

The Court denies defendants' motion to exclude Dr. Trecki's testimony. The Court does not find Dr. Trecki's methodologies unreliable under *Daubert* and Rule 702. Because "the research and study of controlled substance analogues is unique," the use of animal studies is permissible. *Bays*, 2014 WL 3764876, at *14. Defendants' concerns about Dr. Trecki's reliance on animal studies and preclinical data go to the weight of the evidence and not admissibility. *See Lawton*, 84 F. Supp. 3d at 339. And courts frequently admit preclinical studies like those utilized by Dr. Trecki in controlled substance analogue cases. *Bays*, 2014 WL 3764876, at *14 (citations omitted). This Court, like many others, will allow Dr. Trecki's testimony.

The Court concludes that the proposed testimony of Dr. Willenbring and Dr. Trecki is admissible, and thus denies defendants' motion. If, during trial, defendants believe the testimony of either expert is not helpful to the jury, defendants may renew their objections to such testimony.

### III.   Conclusion

The Court denies defendants' motion to exclude testimony from the IT experts, pharmaceutical representatives, and FDA expert. The Court also denies defendants' motion to

exclude testimony from the analogue drug experts, but directs the government to review Detective Farkes' proposed testimony and provide sufficient notice if necessary. The Court grants in part and denies in part defendants' motion to exclude the financial expert's testimony.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Exclude Government's Expert, I.T. and Law Enforcement Testimony (Doc. 478) is denied in part. This Motion was granted in part by the Court's previous order (Doc. 525).

**IT IS FURTHER ORDERED THAT** defendants' Motion to Exclude and/or Limit Expert Testimony (Doc. 479) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendants' Amended Motion to Exclude Government's Analogue Expert Testimony (Doc. 484) is denied.

**IT IS SO ORDERED.**

**Dated this 2nd day of December, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
